Douglas A. ALEXANDER, Noel E. Meisner, and Story Distributing Company, Plaintiffs,

v.

TEXACO, INC., Defendant.

No. CV–79–52–BLG.

United States District Court, D. Montana, Billings Division.

April 28, 1981.

Richard W. Anderson and Donald W. Molloy, Berger, Anderson, Sinclair, Murphy, Nelson, Edwards, McGimpsey & Molloy, Billings, Mont., for plaintiffs.

Kendrick Smith and William A. Forsythe, Corette, Smith, Pohlman & Allen, Butte, Mont., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTIN, Chief Judge.

On November 17, 1980, the above-entitled cause came on for trial before this Court, the Honorable James F. Battin, Chief Judge, sitting without a jury. The plaintiffs were represented by Richard W. Anderson, Esq., and Donald W. Molloy, Esq., of Berger, Anderson, Sinclair, Murphy, Nelson, Edwards, McGimpsey & Molloy, Billings, Montana. The defendant was represented by Kendrick Smith, Esq., and William A. Forsythe, Esq., of Corette, Smith, Pohlman & Allen, Butte, Montana. The plaintiffs adduced testimony and evidence on November 17, 18 and 19; the defendant's case and the case in rebuttal were presented on November 24 and 25. The Court having considered the testimony and documentary evidence adduced at trial makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

1. Douglas Alexander and Noel Meisner are each citizens of the State of Montana.

2. Story Distributing Company is a Montana corporation having its principal place of business in the State of Montana.

3. Texaco, Inc., is a Delaware corporation having its principal place of business in New York.

4. Lewis Armold owned and operated the Texaco bulk distributorship in Bozeman, Montana, for over 26 years.

5. Lewis Armold conducted his Bozeman Texaco distributorship for 16 years as Story Motor Supply, Inc., a Montana corporation.

6. Texaco, Inc., was the only major petroleum marketer in the United States marketing in all 50 states during the time Armold operated the Texaco distributorship and at the time plaintiffs purchased the Texaco distributorship in Bozeman.

7. In March of 1976, Lewis Armold notified Texaco, Inc., of the pending sale of the operating assets of Story Motor Supply, Inc., "including Story Motor Supply's distributor agreement with Texaco, Inc." Texaco, Inc., was advised that the consummation of the sale to Alexander and Meisner was expressly contingent on Texaco's approval.

8. Alexander and Meisner in their business dealings and in the manner in which they took over the business of Lewis Armold, Story Motor Supply, Inc., acted under the guidance of Texaco, Inc., and its agents in the procedures to be followed in obtaining approval as the new Texaco distributors.

9. On April 1, 1976, Story Motor Supply, Inc., entered a five (5) year distributor agreement with Texaco, Inc., Agreement No. 7643025. The term of the agreement was from May 1, 1976, to April 30, 1981.

10. Between May 1, 1976, and October 1, 1976, Texaco did not, at any time, exercise any contractual right to terminate Story Motor Supply's distributorship agreement nor did Texaco at any time give written notice of its intent to terminate said agreement because of the sale or assignment of Story Motor Supply's assets to Story Distributing Company and Alexander and Meisner.

11. On April 29, 1976, an agreement was entered into between Story Motor Supply, Inc., and Story Distributing Company for the sale and purchase of the operating assets of Story Motor Supply, Inc., by Story Distributing Company.

12. The agreement between Story Motor Supply, Inc., Lewis Armold, and Story Distributing Company, Alexander and Meisner,

was expressly contingent on Texaco's approval of Alexander and Meisner as the new Texaco distributors for Bozeman, Montana.

13. As part of the purchase price of said agreement, Story Distributing Company, Alexander and Meisner were required to purchase intangibles of $30,000.00 and $54,000.00, designated for tax purposes as good will and non-competition.

14. Under the terms of the agreement, Story Distributing Company, Alexander and Meisner had the right to rescind the agreement with Story Motor Supply, Inc., and Lewis Armold at any time after Texaco's refusal to accept them as the new Texaco distributors in Bozeman. The right could be exercised on ten days written notice to Story Motor Supply, Inc., and Lewis Armold.

15. On March 31, 1976, Stan Rottrup, Texaco, Inc.'s Billings division manager, recommended to Texaco's Los Angeles regional headquarters that Alexander and Meisner be approved as the new Texaco distributors in Bozeman, Montana. Stan Rottrup requested expedited approval of the change in distributorship.

16. On May 14, 1976, Texaco, Inc.'s Los Angeles regional headquarters recommended to Texaco New York headquarters that Alexander and Meisner be approved as the new Texaco distributors for Bozeman, Montana.

17. Texaco, Inc., knew or should have known from the information available to them on the application for a change in the Texaco distributorship of the substantial long term investment that Alexander and Meisner were undertaking; Texaco knew or should have known that part of Alexander and Meisner's undertaking was the purchase of leasehold improvements on a Texaco-owned station in Bozeman located at 1211 East Main and that the cost of such improvements to the plaintiffs was in excess of $95,000.00.

18. Texaco, Inc., knew or should have known that the distributorship agreement for which Alexander and Meisner sought approval from Texaco was a material and essential part of the agreement with Lewis Armold to purchase the petroleum business assets of Story Motor Supply, Inc.

19. Texaco, Inc., knew or should have known that because of the large investment Alexander and Meisner were making they would require delivery to accounts at three Texaco locations in Bozeman to recognize a full return on their large investment and obligation. The stations were located at:

(a) 1211 East Main, Bozeman, Montana;

(b) North 7th and I–90, Bozeman, Montana; and

(c) 110 West Main, Bozeman, Montana.

20. Had Alexander and Meisner been advised that Texaco was considering leaving the Montana petroleum market, or that serious studies for such a contingency were being undertaken, the plaintiffs would have exercised their right to rescind the contract with Lewis Armold and would not have entered the four and one-half year distributorship contract with Texaco.

21. Texaco New York headquarters disapproved Alexander and Meisner as the new Texaco distributors for Bozeman, Montana, sometime between May 14, 1976, and May 19, 1976. The Los Angeles regional office of Texaco marketing was advised of the disapproval and directed to instruct the Billings division office of Texaco to renegotiate with Alexander and Meisner.

22. On May 26, 1976, Noel Meisner met with Texaco's division marketing representative, Tim Powers, and was advised that Alexander and Meisner would not be approved as the new Texaco distributors. Meisner was advised that he and Alexander would not receive Texaco approval as the new distributors unless they agreed to purchase two Texaco-owned retail stations in Bozeman and to purchase a leasehold interest in a third Texaco retail station in Bozeman. The stations were located at:

(a) 1211 East Main, Bozeman, Montana;

(b) North 7th and Interstate 90, Bozeman, Montana; and

(c) 110 West Main, Bozeman, Montana.

23. Alexander and Meisner began day-to-day operations of the Bozeman Texaco distributorship, with Texaco's knowledge and consent on or about May 1, 1976. All purchases and accounts were made pursuant to Story Motor Supply's distributorship agreements and were the obligation of Story Motor Supply, Inc., and Lewis Armold.

24. In June of 1976, Alexander and Meisner heard rumors that Texaco had plans to withdraw from the Montana petroleum market.

25. Alexander and Meisner made inquiries in June of 1976 in an attempt to determine whether Texaco had plans to withdraw from the Montana market. They inquired of Tim Powers, C. B. Barningham, and Stan Rottrup of Texaco's Billings division and were told that Texaco had no plans to withdraw from the Montana petroleum market and that no plans for Texaco's market withdrawal existed.

26. William Busman told Douglas Alexander and John Fagan in August of 1977 that Texaco's top management in New York made the decision to withdraw from Montana in June of 1976.

27. Rumors of Texaco's plans to withdraw from the Montana market persisted and in July of 1976, prior to their approval as the Texaco distributors for Bozeman, Montana, Alexander and Meisner again inquired of Stan Rottrup, C. B. Barningham, Tim Powers and other agents of Texaco as to whether Texaco was withdrawing. They were told by the agents of Texaco that there was no basis for the rumor that Texaco had plans to leave Montana.

28. The persistent rumors of Texaco's plans to withdraw from Montana continued and in August of 1976, before Texaco had approved Alexander and Meisner as the Texaco distributors in Bozeman, Alexander and Meisner again asked the agents of Texaco whether Texaco had plans to withdraw from the Montana petroleum market and they were again told that no plans for Texaco's market withdrawal existed.

29. Alexander and Meisner volunteered to go to Texaco's Los Angeles or New York headquarters in an attempt to obtain approval as the Texaco distributors for Bozeman and for the secondary purpose of determining whether or not the rumors of Texaco's plans to withdraw from Montana were true. Alexander and Meisner were advised by Texaco's division marketing personnel to not go to Los Angeles or New York but to follow the normal chain of command within the Texaco organization.

30. Alexander and Meisner advised Texaco that the delay in Texaco's approval and the insistence on the purchase of Texaco's real property interests was impairing their business and was costly to them.

31. On July 22, 1976, Alexander and Meisner offered to purchase the Texaco property at a price of $77,000.00. In making their offer, Alexander and Meisner advised Texaco they would not normally purchase the property but were most anxious to reach a working agreement with Texaco and obtain approval as the new Texaco distributors for Bozeman, Montana. The offer was not accepted.

32. Texaco approved Alexander and Meisner as the new Texaco distributors for Bozeman, Montana, and a distributorship agreement between Story Distributing Company and Texaco was dated October 1, 1976, Distributor Agreement No. 7643089. The distributor agreement did not require Story Distributing Company to purchase the two company-owned retail stations and the leasehold interest in the third Texaco retail station in Bozeman.

33. Story Distributing Company and Alexander and Meisner did not receive a five-year distributing agreement from Texaco; the agreement which Alexander and Meisner received was for the period of October 1, 1976, to April 30, 1981. Texaco's standard distributor agreement was for a five-year period.

34. All final decisions concerning both the planning of Texaco's market withdrawal from Montana and also the approval of Alexander and Meisner as Texaco distributors were made in Texaco's New York headquarters.

35. The plaintiffs had verbal approval from Texaco, Inc., or its agents to operate Story Motor Supply between May 1, 1976, and October 1, 1976.

36. Texaco, Inc., knew or should have known that the distributorship agreement with Texaco, Inc., was a material and essential part of the business which the plaintiffs were purchasing from Lewis Armold.

37. Texaco, Inc., had formulated plans to withdraw from the Montana petroleum market as early as June of 1976 and the plan implemented by Texaco for its Montana market withdrawal does not contain material differences from the market withdrawal plans in existence in the summer of 1976.

38. Texaco's New York headquarters knew before Alexander and Meisner were approved as the new Texaco distributors that Texaco wholesalers and retailers in Montana were asking Texaco's field people in Billings about Texaco's market withdrawal plans and the consideration of market withdrawal.

39. Texaco's New York headquarters deliberately concealed the market withdrawal plans from the Billings division personnel and from Texaco wholesalers in Montana including Alexander and Meisner.

40. Texaco's Los Angeles regional headquarters deliberately concealed knowledge of Texaco's market withdrawal plans from the Billings division personnel and Texaco wholesalers in Montana, including Alexander and Meisner and Story Distributing Company.

41. Texaco's representations to Alexander and Meisner that no plans to withdraw from the Montana market existed were false.

42. The representations made to Alexander and Meisner by Texaco and its agents that Texaco was not withdrawing from the Montana market and that Texaco had no plans to withdraw from the Montana market were material in the plaintiffs' decision to seek Texaco's approval as Texaco distributors and to finalize their contract to purchase the petroleum business assets of Story Motor Supply, Inc.

43. Texaco, Inc., knew or should have known that Alexander and Meisner would act upon the advice and information given to them by Texaco and its agents.

44. Alexander and Meisner and Story Distributing Company relied on Texaco's statements, information and advice concerning Texaco's marketing plans and Texaco's statements that no plans to withdraw from the Montana market existed when they entered the Texaco distributorship agreement with Texaco, Inc., dated October 1, 1976.

45. Texaco's marketing withdrawal plans for Montana were information basic to the transaction which the plaintiffs entered into with Texaco for a distributorship agreement and at the time such transaction was entered into, Texaco knew or should have known that Alexander and Meisner were entering the distributorship agreement under a mistake of fact concerning Texaco's marketing plans and Alexander and Meisner were reasonably entitled to expect either a disclosure of the marketing plan or that Texaco would not make misstatement about the existence of such plans or misstatement about its future in Montana.

46. Because Texaco knew or should have known of Alexander and Meisner's long-term financial commitment and that they were entering an agreement under the mistaken belief that Texaco intended to market in Montana, the objective circumstances created a reasonable expectation that Texaco would disclose its marketing plans or advise the plaintiffs of Texaco's marketing uncertainties to enable them to be in a position to make whatever decision was necessary for their business.

47. Stan Rottrup was advised by William Busman on or about the middle of October 1976 of Texaco's plans to withdraw from the Montana market and was told to deliberately conceal the information from all persons in the Montana petroleum market until an appropriate time was made for the announcement of the decision.

48. Stan Rottrup advised C. B. Barningham in late October of 1976 of Texaco's decision to withdraw from the Montana petroleum market and told C. B. Barningham to deliberately conceal such information from Texaco's customers and wholesale contractors in the Montana petroleum market, including the plaintiffs.

49. Despite personal knowledge of Texaco's plans to leave the Montana market between October of 1976 and April of 1977, C. B. Barningham and Stan Rottrup deliberately gave incorrect information to the plaintiffs and others inquiring of them about the persistent rumors of Texaco's plan to withdraw from the Montana petroleum market.

50. Texaco's marketing U.S. and its management deliberately concealed its marketing plans in Montana despite knowing of specific inquiries from wholesalers, including the plaintiffs, in the Billings area about rumors that Texaco was faced with supply difficulties and may be considering market withdrawal.

51. Texaco, Inc., deliberately promoted and maintained a calculated policy of deceit to protect corporate interests and purposes until it was beneficial to Texaco to make public those matters concerning its marketing plans in Montana which Texaco had previously denied.

52. Alexander and Meisner were not required to purchase the two stations and accept the leasehold interest of the third Texaco station under the terms of their executory contract with Lewis Armold nor was the purchase of the two Texaco stations and the leasehold interest in the third Texaco station in Bozeman contemplated in the business dealings between Lewis Armold and the plaintiffs.

53. The three stations which Texaco attempted to force plaintiffs to purchase and which they were ultimately prompted to purchase by Texaco in order to mitigate their losses, were unnecessary except as delivery points and the ownership of the stations was neither contemplated nor required as a part of the business venture with Lewis Armold.

54. In an effort to accomplish an orderly withdrawal, Texaco adopted a plan of pricing to permit them to drop to a less prominent market profile in Montana.

55. Texaco increased its prices to wholesalers in Montana as well as Pad Four to the point that Texaco's prices became non-competitive. Because of Texaco's non-competitive pricing, they were able to fall from the number two petroleum marketer in Montana with an 11% share of the petroleum marketing in 1976 to a 2½% share in November of 1978.

56. In April of 1977, Texaco advised its wholesalers, including the plaintiffs, about problems which Texaco faced.

57. Texaco set forth a five-point statement as to their plans but deliberately misstated that no decision had been made regarding market withdrawal when in fact the decision had been made by Texaco's marketing and management personnel.

58. Texaco deliberately misstated their position concerning marketing of petroleum products in Montana in response to inquiries from the Montana Congressional delegation and the state government entities.

59. On July 16, 1979, Texaco filed an application with the Economic Regulatory Administration of the Department of Energy to be relieved of its supply obligation to wholesale purchasers and end-users in Montana and other Pad Four states, seeking to terminate all distribution and marketing of motor gasoline in the areas.

60. In November of 1980, Texaco notified all remaining Texaco wholesale distributors in Montana that Texaco was cancelling all distributorship agreements in Montana effective April 30, 1981.

61. Texaco, Inc., had gross revenues of income in the following amounts for the years stated:

(a) 1976 $26,451,851,000.00;

(b) 1977 $28,443,892,000.00;

(c) 1978 $29,124,143,000.00; and

(d) 1979 $39,095,444,000.00.

62. Texaco, Inc., had net income, prior to paying dividends to stockholders of record, in the following amounts for the years stated:

(a) 1976 $869,731,000.00;

(b) 1977 $889,994,000.00;

(c) 1978 $852,461,000.00; and

(d) 1979 $1,759,069,000.00.

63. Texaco, Inc., received annual projected savings of $3,686,000.00 in expenses from its decision to withdraw from the Montana petroleum market as well as achieving a one-time benefit of $10,988,-000.00 from the sale of Texaco assets in Montana and a reduction of its working capital.

64. Texaco, Inc.'s annual sales in the Montana petroleum market were approximately 1.0% of Texaco's annual sales in the United States.

65. Alexander and Meisner would not have purchased $30,000.00 of intangibles from Lewis Armold, designated as good will, but for Texaco's misrepresentation to them of the absence of plans to leave Montana and the affirmative statements that Texaco was staying in Montana. However, the sum of $54,000.00 for non-competition of Lewis Armold was not affected by the misrepresentations.

66. Texaco formulated and implemented a plan for pricing products in Pad Four which enabled Texaco to drop its market representation in Montana by non-competitive pricing which scheme kept the plaintiffs from being competitive and which caused the plaintiffs to lose $150,586.00 by their inability to compete.

67. Because Texaco, Inc., misstated its plans to the plaintiffs concerning marketing in Montana, the plaintiffs assumed a note of $95,000.00 for leasehold improvements in real property owned by Texaco which had no substantial value. The plaintiffs would not have undertaken the assumption of the note but for Texaco's misrepresentation.

68. After April of 1977 and Texaco's announcement of its market plan for Montana, Douglas Alexander spent one-half of his time attempting to obtain a new petroleum supplier. Reasonable compensation for Alexander's time is $12,000.00, one-half of the salary he earned with Story Distributing. The plaintiffs would not have suffered this expense but for Texaco, Inc.'s misstatements which precluded the plaintiffs from exercising their right to rescind the Armold agreement. The plaintiffs were required to obtain a new petroleum supplier to mitigate the damages suffered.

69. But for Texaco's affirmative misrepresentation, the plaintiffs would have had the opportunity and would have exercised their right to rescind their agreement with Lewis Armold upon Texaco's May 1976 refusal to approve them as distributors and would not have been damaged.

70. The Court finds that the plaintiffs have proved the allegations set forth in the final pretrial order by a preponderance of the evidence and that they have been damaged in the amount of $287,586.00 as a direct and proximate cause thereof.

## II. CONCLUSIONS OF LAW

1. Subject matter jurisdiction vests in this Court by virtue of 28 U.S.C. § 1332.

2. Tim Powers, C. B. Barningham, Stan Rottrup, and W. J. Busman were agents of Texaco in all matters herein concerned.

3. The plaintiffs have made a prima facie case of fraudulent misrepresentation against Texaco in that:

(a) Stan Rottrup represented to the plaintiffs that no plans existed with respect to market withdrawal from the Montana petroleum market within the Texaco organization and that Texaco was staying in the Montana petroleum market;

(b) The representations by Stan Rottrup and C. B. Barningham to the plaintiffs were false;

(c) Texaco's continued presence in the Montana petroleum market was material to the plaintiffs' decision to enter into the agreement with Lewis Armold and was material to their decision to refrain from exercising their rights to rescind the agreement with Lewis Armold;

(d) C. B. Barningham and Stan Rottrup had no reasonable basis upon which to believe that Texaco had no plans to withdraw from the Montana market when both persons knew that all such plans were made in New York headquarters, and furthermore neither C. B. Barningham nor Stan Rottrup had a reasonable basis to assert the affirmative representation that Texaco intended to remain in the Montana petroleum market given the circumstances of information requested from the Billings division office of Texaco concerning marketing by New York headquarters the numerous visits to Montana from the marketing representatives in Texaco's New York and Los Angeles headquarters and the repeated persistent rumors that Texaco had plans to withdraw from the Montana market;

(e) C. B. Barningham and Stan Rottrup knew or should have known that the plaintiffs would reasonably act in a manner contemplated upon the representations made by Stan Rottrup and C. B. Barningham;

(f) The plaintiffs were ignorant of the falsity of the statements made by Stan Rottrup that no market withdrawal plans existed and that Texaco intended to stay in the Montana market and further had no reasonable means available to them to otherwise determine the truth or falsity of the misrepresentations;

(g) The plaintiffs and each of them relied upon the truth of the representations made by Rottrup and Barningham;

(h) The plaintiffs had a right to rely upon the representations made to them by C. B. Barningham and Stan Rottrup;

(i) The plaintiffs as a consequence of the affirmative representations of C. B. Barningham and Stan Rottrup were caused to suffer damages in the amount of $287,586.00.

4. The plaintiffs have made a prima facie case of fraudulent inducement and misrepresentation against Texaco, Inc., in that:

(a) Texaco New York headquarters had plans to withdraw from the Montana petroleum market before approving the plaintiffs as the Texaco distributor in Bozeman but deliberately concealed such plans from publication to the plaintiffs and other Texaco wholesalers as well as the public;

(b) The public representations that Texaco would continue to market in Montana and that no plans existed for withdrawal were false;

(c) Texaco's continued presence in the Montana petroleum market was material to the plaintiffs' decision to enter the long-term financial agreement with Lewis Armold and material to their decision to refrain from exercising their rescission rights. Texaco's continued presence in Montana was material to plaintiffs' decision to enter the Texaco distributorship agreement on October 1, 1976;

(d) Texaco New York headquarters and management knew of the plans to withdraw from the Montana petroleum market;

(e) Texaco headquarters, which had to approve the distributorship change, knew or should have known that the plaintiffs were reasonably acting in a manner contemplated upon the express and implied representation that Texaco had no plan to leave Montana but would remain as the only fifty-state marketer of petroleum products;

(f) The plaintiffs were ignorant of the falsity of the representations concerning Texaco's marketing plans and had no reasonable means available to them with which to determine the truth of falsity of Texaco's plans but relied on Texaco's obligation to deal with them in good faith;

(g) The plaintiffs in good faith relied on the truth of the representations made to them concerning Texaco's marketing plans;

(h) The plaintiffs had a right to rely upon Texaco's express and implied representations to them;

(i) As a direct and proximate cause of the plaintiffs' reliance on Texaco, they were caused to suffer damages of $287,586.00.

5. Plaintiffs have made a prima facie case of constructive fraud against Texaco, Inc., in that Texaco knowingly withheld knowledge of its intended withdrawal from Montana and that plaintiffs had no reason

to suspect such a withdrawal due to Texaco's assurances to the contrary.

6. The actions of Texaco in this case in failing to advise Alexander and Meisner of its plans or intentions, and in making affirmative misrepresentations concerning Texaco's marketing plans or intentions to the plaintiffs, were in bad faith, done for Texaco's gain without consideration of the risk or harm to the plaintiffs.

7. Texaco's actions in this case were deliberate and in reckless disregard of the consequences and therefore entitle the plaintiffs to punitive damages in the amount of $500,000.00.

8. The Court adopts any Finding of Fact or mixed Finding of Fact and Conclusion of Law as a Conclusion of Law.

9. The plaintiffs are entitled to judgment and costs.

WHEREFORE, based upon the foregoing Findings of Fact and Conclusions of Law,

IT IS ORDERED that the Clerk of this Court enter judgment by separate document in favor of the plaintiffs and against the defendant in the amount of Two Hundred Eighty-seven Thousand Five Hundred Eighty-six and No/100 Dollars ($287,586.00) actual damages, and Five Hundred Thousand and No/100 ($500,000.00) punitive damages, together with interest and costs.

| | | |
|---|---|---|
| Good Will | — | $ 30,000.00 |
| Assumption of note | — | 95,000.00 |
| ½ Time to find new supplier | — | 12,000.00 |
| Non-competitive pricing | — | 150,586.00 |
| | | $287,586.00 |
| Punitive Damages | — | $500,000.00 |
| | | $787,586.00 |

Let judgment be entered forthwith.